**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
**Thomas P. Smith, Jr.**
**Sandeep Satwalekar**
**Daniel Loss**
**William Conway**
**Amanda Rios**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, New York 10004-2616**
**(212) 336-5571 (Loss)**
**LossD@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>               **Plaintiff,**<br><br>    **-against-**<br><br>**HO WAN KWOK (A/K/A MILES GUO, MILES KWOK, WENGUI GUO AND BROTHER SEVEN), KIN MING JE (A/K/A WILLIAM JE), MOUNTAINS OF SPICES LLC (D/B/A NEW YORK FARM), and G CLUB OPERATIONS LLC,**<br><br>             **Defendants,**<br><br>    **-and-**<br><br>**MEI GUO, QIANG GUO (A/K/A MILESON GUO), HING CHI NGOK, and SIN TING RONG,**<br><br>             **Relief Defendants.** | **COMPLAINT**<br><br>**23 Civ. 2200 (    )**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Ho Wan Kwok (a/k/a Miles Guo, Miles Kwok, Wengui Guo, and Brother Seven)

("Guo"), Kin Ming Je (a/k/a William Je) ("Je"), Mountains of Spices LLC (d/b/a New York

Farm) ("Mountains of Spices"), and G Club Operations LLC ("G Club Operations")

(collectively, "Defendants") and Relief Defendants Mei Guo, Qiang Guo (a/k/a Mileson Guo),

Hing Chi Ngok ("Ngok"), and Sin Ting Rong ("Rong") (collectively, "Relief Defendants"),

alleges as follows:

## SUMMARY

1.       This action concerns multiple offering frauds orchestrated by Guo, an exiled

Chinese businessman living in the United States who targeted retail investors through online and

social media posts and videos.  Since in or about April 2020, Guo has conducted fraudulent

securities offerings (the "Subject Offerings") that have collectively raised at least hundreds of

millions of dollars from investors in the United States and around the world.  Unbeknownst to

those investors, Guo and his financial adviser, Je, misappropriated a large portion of the funds

raised from certain of the Subject Offerings in order to enrich themselves and their family

members, including the Relief Defendants.

2.       Guo pitched three unregistered securities offerings to investors as a means of

obtaining shares in GTV Media Group, Inc. ("GTV"), a media company that Guo founded, and a

fourth offering as a means to obtain a crypto asset security called "H-Coin" that he falsely

claimed was backed by gold reserves.

3.       First, from in or about April 2020 to June 2020, Guo and Je launched an

unregistered offering of GTV common stock (the "GTV Private Placement"), which raised

approximately $452 million.  According to the private placement memorandum (the "GTV

PPM"), GTV's mission was "to build the most popular and safest social media and transaction

platform independent of the Chinese government's censorship and monitoring, allowing the

people of China and the world to realize the freedom of speech and trade."  Guo and Je claimed

that investor funds obtained pursuant to the GTV Private Placement would be used for GTV's operations and business development. In fact, however, just days after the conclusion of the GTV Private Placement, Guo and Je misappropriated $100 million of investor money for the benefit of a company solely owned by Guo's son, Qiang Guo.

4. Second, following the GTV Private Placement, from in or about July 2020 through March 2021, Guo solicited investments in an at least $150 million unregistered offering of convertible loans that could be exchanged for GTV common stock (the "Convertible Loan Offering"). Before and during the Convertible Loan Offering, Guo made material misrepresentations relating to GTV's valuation and the price at which GTV stock traded, falsely claiming, for example, that GTV was worth as much as $20 billion and that the stock was trading at $18 per share, mere months after the GTV Private Placement offered the stock at just $1 per share. These misrepresentations were important to investors' decisions to purchase GTV's convertible loans. Guo also misappropriated at least tens of millions of dollars raised from the Convertible Loan Offering.

5. Third, from in or about October 2020 through December 2021, Guo and G Club Operations sold memberships in a concierge service called G-Clubs (a/k/a G-Club and G|CLUBS) pursuant to an unregistered offering (the "G-Clubs Offering"). In connection with the G-Clubs Offering, Guo and G Club Operations falsely represented that purchasers of G-Clubs memberships would receive shares of GTV and/or G Fashion LLC ("G-Fashion"), a related company that held itself out as a fashion retailer. In fact, contrary to these representations, numerous G-Clubs members did not receive stock in either GTV or G-Fashion as promised. As with the Convertible Loan Offering, Guo's misrepresentations relating to GTV's valuation and the trading price of its stock were important to investors' decisions to

participate in the G-Clubs Offering. Out of at least $255 million raised pursuant to the G-Clubs Offering, Guo and members of his family, including Mei Guo, Qiang Guo, and Ngok, received approximately $51 million in misappropriated investor funds for their personal benefit.

6.     Finally, beginning in at least approximately October 2021, Guo made material misrepresentations to prospective purchasers of a crypto asset security called H-Coin (a/k/a Himalaya Coin or HCN). For example, Guo falsely claimed that 20% of H-Coin's value was held in gold reserves. Additionally, Guo falsely stated that he would compensate investors for losses related to their H-Coin purchases. From approximately May 2021 through October 2022, thousands of investors contributed an aggregate of approximately at least $500 million for the purchase of H-Coin and a purported companion stablecoin, H-Dollar. Most of these investments occurred after Guo made the misrepresentations discussed herein.

## VIOLATIONS

7.     By virtue of the foregoing conduct and as alleged further herein, Defendants Guo and Je have committed securities fraud and Defendants Guo, G Club Operations, and Mountains of Spices offered and sold unregistered securities. Defendant Je also aided and abetted some of Guo's securities fraud violations.

8.     Defendants Guo, Mountains of Spices, and G Club Operations violated Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)].

9.     Defendants Guo and Je violated Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§77q(a)(1) and 77q(a)(3)] and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

10.     Defendant Guo further violated Section 17(a)(2) of the Securities Act [15 U.S.C.

§ 77q(a)(2)] and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5(b)

thereunder [17 C.F.R. § 240.10b-5(b)].

11.　　Pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section

20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Je aided and abetted Guo's violations of Section

17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b)

thereunder.

12.　　Unless Defendants are restrained and enjoined, they will engage in the acts,

practices, transactions, and courses of business set forth in this Complaint or in acts, practices,

transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

13.　　The Commission brings this action pursuant to the authority conferred upon it by

Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d)

of the Exchange Act [15 U.S.C. § 78u(d)].

14.　　The Commission seeks a final judgment: (a) permanently enjoining Defendants

from violating the federal securities laws and rules this Complaint alleges they have violated;

(b) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations

alleged here and to pay prejudgment interest thereon pursuant to Sections 21(d)(3), 21(d)(5) and

21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)]; (c) ordering

Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15

U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(d) permanently prohibiting Guo from participating in the offer or sale of securities, including

crypto asset securities, except for transactions in his own personal account, pursuant to Section

21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)]; (e) permanently prohibiting Guo and Je

from serving as an officer or director of any company that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; (f) ordering Mei Guo, Qiang Guo, Ngok, and Rong to pay, with prejudgment interest, all ill-gotten gains by which they were unjustly enriched, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)]; and (g) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

16.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

17.     Venue lies in this District under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Defendants may be found in, are inhabitants of, or transact business in the Southern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including the solicitation of investors in the Subject Offerings and the receipt and diversion of investor funds.  For example, GTV was headquartered in this District and Guo resided in this District during some of the relevant conduct.

## DEFENDANTS

18.     **Guo**, age 54, is a Hong Kong citizen living in New York, New York and

Greenwich, Connecticut.  At all relevant times, Guo controlled GTV, Saraca Media Group, Inc. ("Saraca"), G Club Operations, and G-Fashion.  Guo is not registered with the Commission in any capacity.  Guo asserted his Fifth Amendment right against self-incrimination in response to being subpoenaed for documents and testimony in the Commission staff's investigation preceding the filing of this action.

19.    **Je**, age 55, is a dual Hong Kong and United Kingdom citizen currently living in London, United Kingdom.  Je is a long-time investment banker and financial adviser to Guo and his family.  Je served as GTV's adviser for the GTV Private Placement and also owns and controls various companies that received investor funds raised pursuant to the Convertible Loan Offering and G-Clubs Offering.  Je is also the owner of an entity that purported to operate the so-called "Himalaya Exchange," through which H-Coin was offered and sold to the investing public.

20.    **G Club Operations**, formed in 2020, is a Puerto Rico company with its principal places of business in Puerto Rico and New York, New York.  G Club Operations operates the G-Clubs membership program and directly and indirectly received at least $255 million in investor proceeds during the G-Clubs Offering.  G Club Operations is not registered with the Commission in any capacity.

21.    **Mountains of Spices**, formed in 2019, is a New York company with its principal place of business in Great Neck, New York.  Mountains of Spices directly and indirectly collected over $24.6 million in investor funds pursuant to the Convertible Loan Offering.  Mountains of Spices is not registered with the Commission in any capacity.

### RELIEF DEFENDANTS

22.    **Mei Guo**, age 34, is a Hong Kong citizen living in New York, New York and Greenwich, Connecticut.  Mei Guo is Guo's daughter.  In February 2021, a corporate entity

solely owned by Mei Guo ("Company 1") received approximately $18 million in proceeds from the Convertible Loan Offering.  In October 2021, Company 1 transferred $400,000 of such proceeds to Mei Guo's personal bank account.  In addition, between March and May 2021, a company that is wholly-owned by Qiang Guo ("Company 2") transferred a total of $650,000 in Convertible Loan Offering proceeds to Mei Guo's personal bank account.  Mei Guo and Company 1 had no legitimate claim to the funds they received that are traceable to the Convertible Loan Offering.

23.     **Qiang Guo**, age 36, is a Hong Kong citizen residing in London, United Kingdom. Qiang Guo is Guo's son.  Qiang Guo is the beneficial owner of Saraca, which used at least $100 million of GTV Private Placement investor funds for its own benefit, contrary to the disclosures to GTV Private Placement investors.  Qiang Guo is the sole owner of Company 2, which received approximately $27 million in Convertible Loan Offering investor funds.  In May and June 2021, Company 2 transferred $20 million of these investor funds to a bank account based in Switzerland belonging to Qiang Guo.  In June 2021, Qiang Guo used approximately $3.5 million in G-Clubs Offering investor funds to purchase a Ferrari race car.  Qiang Guo, Saraca, and Company 2 had no legitimate claim to these investor funds they received.

24.     **Ngok**, age 54, is a Chinese citizen residing in Greenwich, Connecticut.  Ngok is Guo's wife and is the sole owner of a corporate entity ("Company 3") that received approximately $5 million in Convertible Loan Offering investor funds in October 2020. Company 3 is also the 100% owner of a mansion in Greenwich, Connecticut, which was one of Guo's residences during the time period of the Subject Offerings.  Ngok and Company 3 had no legitimate claim to the Convertible Loan Offering investor funds they received.

25.     **Rong**, age 52, is a Hong Kong citizen residing in London, United Kingdom.

Rong is Je's wife.  Between about January 2021 and February 2021, Je transferred approximately $3 million in Convertible Loan Offering proceeds from one of his companies to Rong's personal bank account.  Rong had no legitimate claim to the investor funds she received.

### OTHER RELEVANT ENTITIES

26.     **G Fashion LLC (a/k/a G|FASHION)** ("G-Fashion"), formed in 2020, is a Puerto Rico company with its principal place of business in New York, New York.  According to the company's website, G-Fashion owns and operates "a global luxury brand, featuring bespoke collections by the world's top designers" and "serves as the fashion counterpart to G Clubs, and will provide exclusive benefits to G Clubs members."

27.     **GNews Media Group, Inc.** ("GNews"), formed in 2019, is a Delaware corporation with its principal place of business in Puerto Rico.  GNews is 100% owned by Saraca, a Delaware company owned by Guo's son, Qiang Guo.  According to the GTV PPM, Guo and Saraca operate GNews.  GNews' website describes GNews as "one of the world's leading social media platforms" and features Guo's videos and related content, including sections of the website entitled "Miles Guo" and "Miles' Text."  The GNews website also contains links to the websites for G-Clubs, G-Fashion, and the so-called Himalaya Exchange, as well as articles that summarize H-Coin's purported recent trading activity.

28.     **GTV**, formed in April 2020, is a Delaware corporation with its principal place of business in New York, New York.  GTV owned and operated a news-focused social media website and mobile application.  In September 2021, GTV agreed to settle Commission charges that it violated Sections 5(a) and 5(c) of the Securities Act by conducting the GTV Private Placement. GTV's website was taken down in March 2022 and the company has been inactive and insolvent since at least that time.

29.     **Saraca** formed in May 2018, is a Delaware corporation with its principal place of business in New York, New York.  Saraca is the parent company of GTV and is solely owned by Qiang Guo.  In September 2021, Saraca agreed to settle Commission charges that it violated Sections 5(a) and 5(c) of the Securities Act in connection with the GTV Private Placement.

## FACTS

### I.    Background on Guo

30.     Guo is an exiled Chinese businessman who has been in the United States since in or around 2014.  In 2017, Guo applied for political asylum in the United States and that application remains pending.

31.     The GTV PPM, dated April 2020, describes Guo as a successful businessman and a billionaire.

32.     On or about February 15, 2022, Guo filed for Chapter 11 bankruptcy protection, claiming assets valued between $50,000 and $100,000 and liabilities valued between $100 million and $500 million.

33.     Following his departure from China, Guo became a vocal critic of the Chinese government and developed a large social media following among the Chinese diaspora on YouTube and Gettr.

### II.    The GTV Private Placement

34.     On or about April 17, 2020, Guo established GTV to own and operate a news-focused social media platform.

35.     At the time of its formation, GTV was a wholly-owned subsidiary of Saraca, which has at all relevant times been beneficially owned by Guo's son, Qiang Guo.

36.     Days after the creation of GTV, on April 21, 2020, Guo announced via a video

posted on his YouTube channel (the "Launch Video") the unregistered offering of between 20 million and 200 million newly-issued shares of GTV common stock at a price of $1 per share (*i.e.,* the GTV Private Placement).

37.     The Launch Video, which has had over 4,000 views, described GTV as a social media platform like WeChat in China.

38.     The Launch Video further claimed that GTV had the potential to "go beyond" WeChat and other successful platforms and "become a world comprehensive service platform which is decentralized serving investors and having the most advanced technologies including modern finance and modern block chain." [1]

39.     The Launch Video provided Guo's mobile phone number for potential investors to use for inquiries about the offering.

40.     In addition to participating in the Launch Video, Guo directed the preparation of the GTV PPM.  Although others contributed to its preparation, Guo exercised authority over the GTV PPM's contents.

41.     Je, who served as GTV's adviser for the GTV Private Placement, also edited the GTV PPM and other offering documents such as the "Investment Procedure Guidelines," an instructional step-by-step guide that was sent to potential investors along with the GTV PPM.

42.     The GTV PPM stated that GTV's mission was to "build the most popular and safest social media and transaction platform independent of the Chinese government's censorship and monitoring, allowing the people of China and the world to realize the freedom of speech and trade."

43.     According to the GTV PPM, GTV's social media platform would be "the first

---

[1]     Certain statements attributed herein to Guo have been translated from Mandarin to English.

ever platform which will combine the power of citizen journalism and social news with state-of-the-art technology, big data, artificial intelligence, block-chain technology and real-time interactive communication" and planned to be "the only uncensored and independent bridge between China and the Western world."

44.     The GTV PPM described Guo as a "billionaire" as well as GTV's "sponsor and adviser."

45.     The GTV PPM stated that GTV Media planned to use the proceeds from the GTV Private Placement to "expand and strengthen the business."

46.     The GTV PPM also contained the table depicted below representing the specific "contemplated" uses of investor proceeds set forth therein:

| Description | Percentage of Proceeds |
| --- | --- |
| Acquisition of companies to strengthen and grow GTV | Approximate 70% |
| Upgrade of GTV technology and security | Approximate 10% |
| Marketing | Approximate 8% |
| Working capital | Approximate 7% |
| Other | Approximate 5% |
| Total | 100% |

47.     The GTV PPM noted that GTV's management would have "considerable discretion over the use of proceeds."

48.     The GTV PPM did not disclose a plan to use any portion of the proceeds from the GTV Private Placement for the benefit of Saraca or the personal benefit of Guo or his family members.

49.    The GTV PPM provided Guo's mobile phone number for potential investors to use for inquiries about the offering.

50.    The GTV Private Placement was not made pursuant to an effective registration statement filed with the Commission.

51.    Guo solicited the general public for the GTV Private Placement by posting videos on his publicly-accessible pages on social media platforms, such as YouTube, as well as GTV's and GNews's respective websites, www.gtv.org and www.gnews.org.

52.    In addition, Guo personally disseminated information about the GTV Private Placement to hundreds of prospective investors via WhatsApp messages.  These messages included links to both the Launch Video and a Google Drive folder that contained copies of the GTV PPM, Investment Procedure Guidelines, and other offering materials, none of which was password protected or contained any restriction on who could view them or any limitations on their ability to be shared.

53.    Guo did not perform adequate due diligence to ensure that the persons solicited during the GTV Private Placement were accredited investors.

54.    The GTV Private Placement closed on June 2, 2020 and, in total, raised approximately $452 million from more than 1,000 investors, including U.S. investors.

55.    Pursuant to the GTV Private Placement's investment instructions that were set forth in the Investment Procedure Guidelines – the contents of which were known to Guo and Je – the vast majority of the offering proceeds were deposited directly into Saraca's bank accounts.

56.    Three days after the close of the GTV Private Placement, on or about June 5, 2020, Saraca invested $100 million (approximately 22%) of the proceeds from the GTV Private Placement in a hedge fund ("Hedge Fund A").  Saraca made this investment on its own behalf

and, by extension, for the benefit of Qiang Guo.

57.    Hedge Fund A's investment strategy involved taking positions in various Asian currencies, particularly the Hong Kong dollar, versus certain developed market currencies through foreign currency forward and option contracts.

58.    Guo and Je made the decision for Saraca to invest GTV Private Placement investor funds with Hedge Fund A and negotiated the terms of the investment.

59.    Guo and Je had expressed investment interest to Hedge Fund A's portfolio manager on multiple occasions since 2018.

60.    On or about May 26, 2020, Je instructed Hedge Fund A to have $100 million invested in Saraca's name and provided Hedge Fund A with the required documentation for the investment, including Saraca's "KYC" information and executed subscription agreements.

61.    On June 4, 2020, Je sent an email to Hedge Fund A stating "we will wire the funds tomorrow."

62.    At the time of this investment, Guo and Je knew or recklessly disregarded that Saraca's investment was made using investor funds from the GTV Private Placement and that the investment was contrary to the use of funds provisions in the GTV PPM.

63.    Guo and Je also concealed Saraca's use of GTV Private Placement investor funds for its Hedge Fund A investment from GTV's board of directors and officers.

64.    For example, Je attended GTV's first board meeting on July 1, 2020 and did not inform the GTV board that $100 million of the GTV Private Placement proceeds had been invested for Saraca's benefit in Hedge Fund A even though the GTV Private Placement was one of the main topics of discussion at the meeting.

65.    As a result of investment losses sustained by Hedge Fund A, Saraca lost

approximately $30 million of its $100 million investment with Hedge Fund A by the time it

liquidated its investment in October 2021.[2]

### III.   Guo Misrepresents the Valuation of GTV and G-Fashion

66.     From at least June through August 2020, Guo released additional videos on

YouTube and the GTV website discussing GTV, as well as a new enterprise, G-Fashion.

67.     On its website, G-Fashion purports to be "a global luxury brand, featuring

bespoke collections by the world's top designers" and "serves as the fashion counterpart to

G|CLUBS, and will provide exclusive benefits to G|CLUBS members."

68.     On several occasions, in these videos, Guo made materially false and misleading

statements concerning the valuation of GTV and G-Fashion.

69.     For example, in a video publicly disseminated on June 2, 2020, Guo stated:

> Given the tremendous demand for GTV shares and the good capital position of
> GTV going forward, my lawyers and financial experts mutually agree that a $2
> billion valuation is probably too low and that the company is probably closer to
> $10 billion given the tremendous demand for GTV shares.

70.     As Guo knew or recklessly disregarded, he had not received advice from lawyers

and financial experts supporting a valuation of close to $10 billion, and such a valuation was

inaccurate.

71.     Guo further asserted his Fifth Amendment right against self-incrimination in

response to an investigative subpoena for testimony relating to his statements about GTV's

valuation.

72.     On or about June 17, 2020, Guo released another video to the general public.  As

---

[2]      Pursuant to a September 13, 2021 Order Instituting Cease-and-Desist Proceedings that was issued in
connection with an SEC proceeding (*In the Matter of GTV Media Group, Inc. et al.* (File No. 3-02537)), Saraca
transferred the remaining approximately $70 million from its Hedge Fund A investment to a Fair Fund where it will
be distributed to GTV Private Placement investors.

to the valuation of GTV, he stated:

> Just now, two or three hours ago, a comrade sold 10 thousand [GTV] shares, 10 thousand shares, and a deal has been concluded for $18 a share, $18 per share. But our investment committee was not happy and wanted to buy them all back for $20.

73.     As Guo knew or recklessly disregarded, no such transaction had taken place, and GTV, which did not have an investment committee, had no plans to repurchase GTV shares from GTV Private Placement investors at $20 per share.

74.     On or about August 2, 2020, Guo issued a public video claiming that "the market value of GTV stock [was] 20 billion dollars."

75.     In the same video, Guo claimed that "[i]f G-Fashion goes public, it will be worth $100 billion for sure."

76.     At the time he made these statements, Guo knew or recklessly disregarded that GTV was not worth close to $20 billion and that G-Fashion would not be worth $100 billion after going public.

## IV.     The Convertible Loan Offering

77.     On or about July 22, 2020, during the timeframe in which he was making misrepresentations about GTV's valuation, Guo announced a new securities offering by the Himalaya Farm Alliance through which investors could obtain GTV stock (*i.e.,* the Convertible Loan Offering).  Guo made this announcement in a publicly available video.

78.     The Himalaya Farm Alliance was a collective comprised of informal groups of Chinese expatriates, with each such group known as a "Farm."  The Himalaya Farm Alliance was purportedly dedicated to advancing the Chinese pro-democracy movement.

79.     Farms were located in various cities both within and outside the United States, including New York City.

80.     In most cases, the Farms were associated with a corporate entity.  The so-called "New York Farm" was associated with Mountains of Spices.

81.     In the July 22, 2020 video announcing the Convertible Loan Offering, Guo explained that the Farms were offering convertible loans with a three-year term that, at maturity, would be convertible into one share of GTV stock for each dollar in principal and/or interest owed.

82.     The Convertible Loan Offering was not made pursuant to an effective registration statement filed with the Commission.

83.     From in or about August 2020 through March 2021, following Guo's false statements about GTV and its stock discussed above in Section III, the U.S.-based Farms raised at least $150 million from the general public in connection with the Convertible Loan Offering, including approximately $24.6 million raised by Mountains of Spices.

84.     Neither Guo nor the Farms, including Mountains of Spices, performed any due diligence in order to determine whether the investors in the Convertible Loan Offering were accredited investors.

85.     In connection with the Convertible Loan Offering, the Farms provided prospective investors with a "Loan Agreement" that represented that the investor's money would be used for a specific Farm's "general working capital purposes."

86.     In fact, however, Guo misappropriated a substantial portion of Convertible Loan Offering funds raised by the U.S.-based Farms, including Mountains of Spices.  Such funds were ultimately used for the benefit of Guo, Je, and members of their families.

87.     Over the course of the Convertible Loan Offering, through on or about April 20, 2021, Guo directed the Farms to transfer approximately $81 million of the Convertible Loan

Offering proceeds to an Abu Dhabi bank account in the name of a Hong Kong company owned and controlled by Je ("Company 4").  The investor funds in Company 4's account were commingled with other funds.

88.     Between in or about August 2020 and April 2021, Guo directed the transfer of approximately $35 million of Convertible Loan Offering investor funds, including Mountains of Spices investor funds, from Company 4's account to Company 1's, Company 2's and Company 3's bank accounts, which were under the control of Relief Defendants Mei Guo, Qiang Guo, and Ngok, respectively.  Specifically, Company 1, which was controlled by Mei Guo, received approximately $18 million; Company 2, which was controlled by Qiang Guo, received approximately $11 million; and Company 3, which was controlled by Ngok, received approximately $5 million.

89.     In turn, from Company 1's and Company 2's bank accounts, among other things:

    a.     $20 million was transferred to a bank account belonging to Qiang Guo based in Switzerland, of which approximately $330,000 was used for the purchase of a plane;

    b.     $1 million was transferred to bank accounts in the name of Mei Guo;

    c.     Approximately $2.3 million was paid towards yacht servicing costs;

    d.     Approximately $600,000 was paid to luxury automobile, motorcycle and power sport dealerships;

    e.     Approximately $281,000 was paid to an aircraft manufacturer; and

    f.     Approximately $950,000 was paid to a private flight crew company.

90.     Ngok, Mei Guo, and Qiang Guo did not have legitimate claims to the Convertible Loan Offering investor funds they received.

91.     Company 4 separately transferred an additional approximately $66.3 million, comprised largely of Convertible Loan Offering investor funds, to other accounts that were under the control of Je and Rong.

92.     These transfers included, among others, $7 million to Je's personal bank accounts and $3 million to Rong's personal bank account.

93.     Neither Je nor Rong had a legitimate claim to receive these Convertible Loan Offering investor funds.

**V.      The G-Clubs Offering**

94.     On or about June 20, 2020, after touting falsely inflated valuations for GTV and G-Fashion, Guo announced a new concierge service called G-Clubs and the sale of G-Clubs memberships (*i.e.*, the G-Clubs Offering).  Guo made the announcement via a video posted on the GTV website.

95.     Guo represented in the video that purchasing a G-Clubs membership would entitle the purchaser to shares of GTV or G-Fashion stock.

96.     In at least four subsequent videos, which appeared on publicly accessible pages on GTV's website and on YouTube between approximately July 22, 2020 and August 12, 2021, Guo repeated his representation that purchasers of G-Clubs memberships would receive shares of GTV stock and/or G-Fashion stock.

97.     G-Clubs launched in October 2020 and offered five tiers of memberships that ranged in cost from $10,000 to $50,000.  The membership benefits purportedly included "exclusive early access to [sic] latest fashion collections, including special member pricing on purchases, extended video blogging time and early access to select music."

98.     Between in or about October 2020 and December 2021, G Club Operations sold at least approximately $255 million in G-Clubs memberships to investors throughout the world,

including the United States.

99.     Some investors purchased multiple G-Clubs memberships or wired funds in excess of the cost of the highest G-Clubs membership tier of $50,000 in order to acquire a greater number of GTV or G-Fashion shares.

100.    The sale of GTV and G-Fashion stock through the G-Clubs Offering was not pursuant to an effective registration statement filed with the Commission.

101.    Guo solicited investors for the G-Clubs Offering through his numerous publicly-accessible videos on GTV's website and YouTube.

102.    Individuals who were interested in purchasing a G-Clubs membership were directed to fill out an application on G-Clubs' website.  The application lacked financial questions that would make it possible to evaluate whether the individual qualified as an accredited investor.

103.    G Club Operations reviewed and processed the membership applications, and G-Clubs Offering investors were directed to send their investment funds to G Club Operations' bank accounts.

104.    Guo knowingly or recklessly misappropriated at least approximately $51 million of $255 million in investor funds that were raised from the G-Clubs Offering as follows:

a.  In June 2021, $3.5 million of the G-Clubs investor funds were used to purchase a Ferrari race car from a Beverly Hills-based Ferrari dealership for Qiang Guo;

b.  In December 2021, $26.5 million of the G-Clubs Offering investor funds were used towards the purchase of a 50,000 square foot mansion in Mahwah, New Jersey intended for the use and benefit of Guo, Ngok, Mei Guo, and Qiang

Guo;

c.  Between December 2021 and March 2022, an additional $13 million of

G-Clubs Offering investor funds was used to pay for renovations to Guo's

Mahwah, New Jersey mansion, as well as various furniture and decorative

expenditures, such as $978,000 for Chinese and Persian rugs, a $62,000

television, a $59,000 watch storage box, a $53,000 fireplace log cradle holder,

and a $35,000 mattress; and

d.  Between in or about August 2021 and November 2021, G-Clubs Offering

investor funds were used to pay for various luxury items and services for Guo

and his family, including $2.7 million for a yacht and yacht-related expenses,

$2.9 million for a Bugatti automobile, $832,000 for a Lamborghini, and

approximately $1.5 million for other vehicles and racing-related expenses.

105.  Guo, Ngok, Mei Guo, and Qiang Guo did not have legitimate claims to receive

these G-Clubs Offering investor funds.

106.  To date, purchasers of G-Clubs memberships have not received GTV or

G-Fashion stock.

## VI.    The H-Coin Offering

107.  In or around April 2021, the so-called Himalaya Exchange announced an

upcoming initial offering of H-Coin, a new crypto asset security, and posted a "White Paper" for

H-Coin on its website.[3]

108.  The White Paper stated that the H-Coin Offering would involve the sale of 1

---

[3]      The April 2021 announcement also referenced the sale of "HCN Credits," which the Himalaya Exchange
website explained correspond to an investor's holding in H-Coin.  For purposes of this Complaint, all references to
"H-Coin" include HCN Credits.

billion H-Coins at a price of $.10 per coin and contained a graph depicting the potential for high investment returns.

109. On or about September 24, 2021, the CEO of the Himalaya Exchange described H-Coin as an "investment coin" in a videotaped interview posted on GTV's website.

110. On or around October 20, 2021, in a publicly-available online video, Guo discussed the upcoming launch of H-Coin and stated that he had "designed" H-Coins. In subsequent publicly-available videos, including a video posted on Guo's GNews website on or about June 2, 2022, Guo touted the liquidity of H-Coin, which was purportedly traded on the "Himalaya Exchange."

111. Additionally, in the October 20, 2021 video, Guo stated, in substance, that H-Coin "has 20% gold" and that "[n]o matter how much [H-Coin] raises, 20% will turn into gold."

112. Guo also stated in the October 20, 2021 video that H-Coin would make money and that he would compensate investors for "100%" of investment losses attributable to H-Coin.

113. On or around November 1, 2021, Guo announced via a publicly-available online video the official launch of H-Coin, along with a purported companion stablecoin, H-Dollar, through the so-called Himalaya Exchange. Guo explained that H-Coin could be purchased using H-Dollar and that H-Dollar would be linked to the U.S. Dollar on a 1-to-1 basis.

114. Guo told prospective investors in the November 1, 2021 announcement that the price of H-Coin "will be far beyond your imagination."

115. On or around the same date, Guo released a music video entitled "Hcoin to the Moon" on YouTube and Vevo. GNews' website also posted a link to the music video and referred to it as "Mr. Guo's new song."

116. The phrase "to the moon" is used in the crypto asset space to signal expectations

that a crypto asset will dramatically increase in value.

117.    The "Hcoin to the Moon" video prominently featured Guo and provided the website address for the so-called Himalaya Exchange, through which investors could purchase H-Coin.

118.    The "Hcoin to the Moon" video also contained a caption stating in English, "20% gold reserve attaches to the value."

119.    Similarly, on or about November 1, 2021, the GNews website, which is operated by Guo and Saraca, reported that H-Coin would be "pegged to gold" through gold reserves "equal to 20% of the market value of the H-Coin."

120.    Guo, who has been seeking asylum in the U.S. since 2017, made the statements regarding H-Coin discussed above while residing in the United States.

121.    Guo also knew, or recklessly disregarded, the false and misleading nature of the his statements relating to (i) the supposed gold backing of 20% of H-Coin and (ii) his proffered intent to repay H-Coin investors for their losses.

122.    Based on the H-Coin Offering's initial issuance (1 billion H-Coins) and subsequent fluctuations in its purported trading value (from $.10 to $46 per coin), as much as $9.2 billion in gold reserves would have been required to cover Guo's promise of securing 20% of H-Coin's value through gold reserves, which neither Guo nor the so-called Himalaya Exchange possessed at any point.

123.    Guo also lacked the financial resources to cover investor losses from the sale of 1 billion H-Coin.

124.    Guo filed for personal bankruptcy, where he declared assets of $100,000 or less, less than four months after making this promise to investors.

125.     Within days of the H-Coin and H-Dollar launch, on or around November 12, 2021, various media articles reported that $100 million had already been raised from the initial sale of H-Coin and that its price has increased from its initial offering price of $.10 to $27.

126.     On or around the same date, the CEO of the Himalaya Exchange was quoted in certain articles as saying that one billion H-Coin had already been sold, equating to a market value of $27 billion, and that the platform had opened more than 20,000 accounts for H-Coin trading purposes.

127.     As of in or around October 2022, thousands of investors had purchased at least $500 million worth of H-Coins or H-Dollars, including at least approximately $373 million purchased on or after November 1, 2021.  These funds were pooled in U.S. bank accounts belonging to the so-called Himalaya Exchange and purportedly used to pay for salaries and consulting firms.

128.     Some H-Coin investors have attempted unsuccessfully to liquidate their purported H-Coin holdings.

## VII.    The Subject Offerings Constituted the Offer and Sale of "Securities"

129.     As with the GTV Private Placement, which involved the offer and sale of GTV common stock, the other Subject Offerings constituted the offer and sale of "securities" under the federal securities laws.

130.     The Convertible Loan Offering constituted offers and sales of "securities" under the federal securities laws because of the ability of investors to convert their loans into GTV common stock.

131.     In addition, the convertible loans that were offered and sold through the Convertible Loan Offering are notes that are securities based on *Reves v. Ernst & Young*, 494 U.S. 56, 64-65 (1990).  Specifically, investors purchased the notes expecting to earn profits in

the form of interest based on the performance of the Farms and GTV and to invest in GTV, while the seller's stated purpose was to raise money for "general working capital purposes," *i.e.*, for general use of a business enterprise. The convertible loans were offered through a general solicitation to a broad segment of the public, and the public would reasonably expect that these loans convertible to GTV common stock were investments. There also is no other regulatory scheme that would render the application of the federal securities laws unnecessary. Thus, under *Reves*, the convertible loans were notes and offered and sold as securities.

132. Moreover, the convertible loans were also offered and sold as investment contracts and, therefore, are securities under Section 2(a)(1) of the Securities Act, pursuant to *SEC v. W.J. Howey Co.*, 328 U.S. 298-99 (1946). The Convertible Loan Offering involved an investment of money that was pooled as part of a common enterprise in the bank accounts controlled by Guo, and investors would share in the success of the enterprise through the returns on the loan that were promised and the ability to convert the loan to GTV stock. Convertible Loan Offering investors, who were entirely passive, also had a reasonable expectation of profits that would be derived from the entrepreneurial and managerial efforts of GTV based on the glowing statements made by Guo as to GTV's valuation and secondary market trading activity.

133. The G-Clubs memberships constituted offers and sales of GTV and G-Fashion common stock and, therefore, are securities under the federal securities laws.

134. The G-Clubs memberships are securities under Section 2(a)(1) of the Securities Act because, pursuant to *Howey*, they were offered and sold as investment contracts. Guo represented to prospective G-Clubs members that they would receive GTV and/or G-Fashion stock in exchange for their investments. The G-Clubs memberships involved an investment of money that was pooled as part of a common enterprise in the bank accounts controlled by

G-Clubs.  G-Clubs Offering investors, who were entirely passive, also viewed the G-Clubs

Offering as an opportunity to profit from the entrepreneurial and managerial efforts of GTV and

G-Fashion based on the glowing statements made by Guo as to GTV's and G-Fashion's

valuation and secondary market trading activity of GTV stock.  Specifically, when touting the

ability of G-Clubs Offering investors to obtain GTV and G-Fashion stock, Guo stated GTV was

now worth up to 20 times as much per share and routinely touted the prospects of GTV's and

G-Fashion's online platform.

135.    Because G-Clubs Offering investors were told that G-Clubs memberships were a

way to obtain GTV and G-Fashion stock, G-Clubs Offering investors' return on investment

depended on the success or failure of (1) GTV's management's ability to develop its social

media platform and/or (2) G-Fashion's management's development of a "Multi-lingual fashion

e-commerce platform" and the desirability of its "high end collection by the world's top

designers" and "featured furniture line (work in progress)" that were to be sold on the platform.

Therefore, G-Clubs Offering investors, some of whom purchased multiple memberships and/or

paid in excess of the $50,000 highest tier membership, had a reasonable expectation that they

would obtain future profits if GTV and/or G-Fashion were successful in its entrepreneurial and

managerial efforts to develop its businesses.

136.    The H-Coins that were offered and sold are investment contracts, and therefore

are securities, under Section 2(a)(1) of the Securities Act, based on the Supreme Court's

framework in *Howey*.  H-Coin investors paid U.S. dollars or H-Dollars to receive H-Coins

through wire transfers and checks to U.S. bank accounts belonging to the so-called Himalaya

Exchange or through transfers on its online platform.  H-Coin investors shared equally in price

increases or decreases of H-Coin.  H-Coin investors, who were passive, also had a reasonable

expectation of profits that would be derived from the entrepreneurial and managerial efforts of the Himalaya Exchange, including its ability to develop an online platform through which investors could transact using H-Coins.

## FIRST CLAIM FOR RELIEF
### Violation of Section 17(a) of the Securities Act
### (Guo)

137.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 136.

138.    By virtue of the foregoing, in connection with each of the GTV Private Placement, Convertible Loan Offering, G-Clubs Offering and H-Coin Offering, Defendant Guo, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, (i) employed devices, schemes and artifices to defraud; (ii) obtained money and property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

139.    By reason of the foregoing, Defendant Guo, directly or indirectly, violated and, unless enjoined, will again violate Securities Act Sections 17(a) [15 U.S.C. §§ 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder
### (Guo)

140.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 136.

141.    By virtue of the foregoing, in connection with each of the GTV Private Placement, Convertible Loan Offering, G-Clubs Offering and H-Coin Offering, Defendant Guo,

directly and indirectly, in connection with the purchase and sale of securities and by the use of

means and instrumentalities of interstate commerce, or the mails, knowingly or recklessly

(i) employed devices, schemes or artifices to defraud; (ii) made untrue statements of material fact

and omitted to state material facts necessary in order to make the statements made, in the light of

the circumstances under which they were made, not misleading; and (iii) engaged in acts,

practices and courses of business which operated or would have operated as a fraud and deceit

upon purchasers of securities and upon other persons.

142.   By reason of the foregoing, Defendant Guo, directly or indirectly, have violated

and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and

Rules 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

**THIRD CLAIM FOR RELIEF**
**Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act**
**(Je)**

143.   The Commission re-alleges and incorporates by reference here the allegations in

paragraphs 1 through 76 and paragraphs 86 through 93.

144.   As described above, in connection with the GTV Private Placement, Defendant

Je, in the offer and sale of securities, by use of the means and instruments of transportation or

communication in interstate commerce or by use of the mails, directly or directly, (i) employed

devices, schemes and artifices to defraud; and (ii) engaged in transactions, practices, and courses

of business which operated or would operate as a fraud or deceit upon the purchasers of such

securities.

145.   By reason of the foregoing, Defendant Je, directly or indirectly, violated and,

unless enjoined, will again violate Securities Act Sections 17(a)(1) and (3) [15 U.S.C.

§§ 77q(a)(1) and (3)].

**FOURTH CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and**
**Rules 10b-5(a) and 10b-5(c) thereunder**
**(Je)**

146.    The Commission re-alleges and incorporates by reference here the allegation in paragraphs 1 through 76 and paragraphs 86 through 93.

147.    As described above, in connection with the GTV Private Placement, Defendant Je, directly and indirectly, in connection with the purchase and sale of securities and by the use of means and instrumentalities of interstate commerce, or the mails, knowingly or recklessly (i) employed devices, schemes or artifices to defraud; and (iii) engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers of securities and upon other persons.

148.    By reason of the foregoing, Defendant Je, directly or indirectly, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

**FIFTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Section 17(a)(2) of the Securities Act**
**(Je)**

149.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 76 and paragraphs 86 through 93.

150.    As described above, in connection with the GTV Private Placement, Defendant Guo, directly or indirectly, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or the mails, knowingly, recklessly, or negligently obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

151.    By engaging in the conduct described, Defendant Guo violated Securities Act Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

152.    Defendant Je intentionally, knowingly or recklessly provided substantial assistance to Defendant Guo.

153.    By reason of the foregoing, Defendant Je aided and abetted the violations of Section 17(a)(2) of the Securities Act by Defendant Guo in connection with the GTV Private Placement and, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Defendant Je is liable to the same extent as Defendant Guo for his violations of Section 17(a)(2) of the Securities Act.

### SIXTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5(b) thereunder**
**(Je)**

154.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 76 and paragraphs 86 through 93.

155.    As described above, Defendant Guo, directly or indirectly, in connection with the purchase and sale of securities for the GTV Private Placement, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, intentionally, knowingly, or recklessly, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

156.    By engaging in the conduct described, Defendant Guo violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. 240.10b-5(b)].

157.    Defendant Je intentionally, knowingly, or recklessly provided substantial assistance to Defendant Guo.

158.    By reason of the foregoing, Defendant Je aided and abetted the violations of Section 10(b) [15 U.S.C. § 78j(b)] of the Exchange Act and Rule 10b-5(b) [17 C.F.R. 240.10b-5(b)] thereunder by Defendant Guo and, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendant Je is liable to the same extent as Defendant Guo for his violations of Sections 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.

### SEVENTH CLAIM FOR RELIEF
### Violations of Sections 5(a) and (c) of the Securities Act
### (Guo)

159.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 76 and paragraphs 129 through 136.

160.    In connection with the GTV Private Placement, the Convertible Loan Offering, and the G-Clubs Offering, Defendant Guo, directly or indirectly, (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or for delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; or (iii) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

161.    By reason of the foregoing, Guo violated and, unless enjoined, will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

**EIGHTH CLAIM FOR RELIEF**
**Violations of Sections 5(a) and (c) of the Securities Act**
**(Mountains of Spices)**

162.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 33, paragraphs 66 through 93, and paragraphs 129 through 132.

163.    In connection with the Convertible Loan Offering, Defendant Mountains of Spices directly or indirectly, singly or in concert, (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or for delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; or (iii) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

164.    By reason of the foregoing, Defendant Mountains of Spices violated and, unless enjoined, will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

**NINTH CLAIM FOR RELIEF**
**Violations of Sections 5(a) and (c) of the Securities Act**
**(G Club Operations)**

165.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 33, paragraphs 66-76, paragraphs 94 through 106, paragraph 129, and paragraphs 133 through 135.

166.    In connection with the G-Clubs Offering, Defendant G Club Operations, directly

or indirectly, singly or in concert, (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or for delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; or (iii) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

167.    By reason of the foregoing, Defendant G Club Operations violated and, unless enjoined, will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

**TENTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(All Relief Defendants)**

168.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 106 and paragraphs 129 through 135.

169.    Between February 2021 and October 2021, Relief Defendant Mei Guo received at least $19 million in Convertible Loan Offering investor funds.  Mei Guo had no legitimate claim to the funds she received.  Mei Guo obtained the funds under circumstances in which it is not just, equitable, or conscionable for her to retain the funds, and therefore was unjustly enriched.

170.    From January 2021 through June 2021, Relief Defendant Qiang Guo received at least $31 million of proceeds from the Convertible Loan Offering and at least $3.5 million in proceeds from the G-Clubs Offering.  Qiang Guo had no legitimate claim to the funds he

received.  Qiang Guo obtained the funds under circumstances in which it is not just, equitable, or conscionable for her to retain the funds, and therefore was unjustly enriched.

171.    In October 2020, Relief Defendant Ngok received $5 million of proceeds from the Convertible Loan Offering.  Ngok had no legitimate claim to the funds she received.  Ngok obtained the funds under circumstances in which it is not just, equitable, or conscionable for her to retain the funds, and therefore was unjustly enriched.

172.    Between January 2021 and February 2021, Relief Defendant Rong received $3 million in Convertible Loan Offering proceeds in her personal bank account.  Rong had no legitimate claim to the money she received.  Rong obtained the funds under circumstances in which it is not just, equitable, or conscionable for her to retain the funds, and therefore was unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Guo and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Sections 5(a) and (c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Sections 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Permanently enjoining Je and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly,

Sections 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)] and Section 10(b) of the Exchange Act

[15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R.  240.10b-5];

### III.

Permanently enjoining Mountains of Spices and G Club Operations and their agents,

servants, employees and attorneys and all persons in active concert or participation with any of

them from violating, directly or indirectly, Sections 5(a) and (c) of the Securities Act [15 U.S.C.

§§ 77e(a) and 77e(c)];

### IV.

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly,

with pre-judgment interest thereon, as a result of the conduct alleged in this Complaint pursuant

to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (d)(5)

and (d)(7)];

### V.

Ordering Defendants to pay civil monetary penalties under Section 20(d) of the Securities

Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

### VI.

Imposing a conduct-based injunction pursuant to Section 21(d)(5) of the Exchange Act

[15 U.S.C. § 78u(d)(5)], prohibiting Guo from participating in the offer or sale of securities,

including crypto asset securities, except for transactions in his own personal accounts;

### VII.

Permanently prohibiting Guo and Je from serving as an officer or director of any

company that has a class of securities registered under Section 12 of the Exchange Act [15

U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15

U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section

21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## VIII.

Ordering Relief Defendants Mei Guo, Qiang Guo, Ngok, and Rong, to pay, with

prejudgment interest, all ill-gotten gains by which they were was unjustly enriched, under

Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5)

and 78u(d)(7)]; and

## IX.

Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

The Commission demands a trial by jury.


Dated: New York, New York
       March 15, 2023

                          /s/ Antonia M. Apps
                          **ANTONIA M. APPS**
                          **REGIONAL DIRECTOR**
                          Thomas P. Smith, Jr.
                          Sandeep Satwalekar
                          Daniel Loss
                          William T. Conway III
                          Amanda Rios
                          Attorneys for Plaintiff
                          SECURITIES AND EXCHANGE COMMISSION
                          New York Regional Office
                          100 Pearl Street, Suite 20-100
                          New York, New York 10004
                          (212) 336-5571
                          lossd@sec.gov